Filed 4/16/14  Talamentes v. All West Iron CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| IGNACIO TALAMENTES, | B244433 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC362390) |
| v. | |
| ALL WEST IRON, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elihu Berle, Judge.  Affirmed.

Law Offices of Lisa L. Maki, Lisa L. Maki and Christina M. Coleman for Plaintiff and Appellant.

Law Offices of Roger O. Vega and Roger O. Vega; Huprich Law Firm and Joseph J. Huprich for Defendants and Respondents AWI Builders, Inc. and Zhirayr Mekikyan.

————————————

Appellant Ignacio Talamentes worked as a welder for All West Iron, Inc., a company owned and operated by Zhirayr Robert Mekikyan.  Ignacio filed a wage and hour action against All West Iron, Mekikyan, and a related company, AWI Builders, Inc., based on alleged violations of the Labor Code and the Unfair Competition Law (Bus. & Prof. Code § 17200 et seq.).  During the pendency of the litigation, All West Iron filed for bankruptcy and Talamentes's claims proceeded to a nonjury trial solely against Mekikyan and AWI Builders on theories of alter ego and joint employer liability.  The trial court found that All West Iron had failed to provide Talamentes with overtime pay and meal and rest periods, but entered a judgment in favor of Mekikyan and AWI Builders on the grounds that Talamentes did not meet his burden of proving alter ego or joint employer liability.  For the reasons set forth below, we affirm.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**I.      Overview of Claims**

In November 2006, Talamentes filed this wage and hour action against All West Iron and Mekikyan in Los Angeles County Superior Court (Case No. BC362390; the *Talamentes* action).  In his complaint, Talamentes alleged claims for failure to pay overtime compensation (Lab. Code, §§ 510, 1194), failure to provide meal and rest periods (Lab. Code, § 226.7), failure to furnish itemized wage statements (Lab. Code, § 226), unlawful withholding of wages (Lab. Code, § 221), waiting time penalties (Lab. Code, § 203), conversion (Civ. Code, § 3336), and unfair competition (Bus. & Prof. Code, § 17200 et seq.).  Talamentes later amended his complaint to add AWI Builders as a defendant.

In December 2008, Jose Ventura Robles, Juan Jesus Robles, Felipe Alvarado, and Iron Workers Union Local 433 filed a related wage and hour action against All West Iron in Los Angeles County Superior Court (Case No. BC403060; the *Robles* action).  The plaintiffs in the *Robles* action also alleged claims for unpaid overtime compensation, missed meal and rest periods, and other violations of the Labor Code, and later added

2

AWI Builders and a third related company, Construction Contractors Corporation (CCC), as named defendants.[1]

In December 2010, All West Iron filed a petition for Chapter 7 bankruptcy, and as a result, both the *Talamentes* and *Robles* actions were stayed by the bankruptcy court. The bankruptcy court later lifted the stay as to each of the named defendants except All West Iron. In June 2011, with the bankruptcy stay as to All West Iron still in effect, the Los Angeles County Superior Court consolidated the *Talamentes* and *Robles* actions for purposes of trial against the remaining defendants. Both actions proceeded to a nonjury trial against Mekikyan, AWI Builders, and CCC only in September 2011. A summary of the relevant evidence presented at trial is set forth below.

## II.    Evidence at Trial

### A.    Relationship Between All West Iron, AWI Builders, and CCC

All West Iron was a steel subcontractor in the construction industry. It was incorporated in 1990 or 1991. Its business address was 2881 Saco Street in Vernon, California and it occupied the first floor of the building at that address. Mekikyan was the president and sole officer and shareholder of All West Iron. He started the business in 1987 and initially worked on small private projects, such as fences, gates, and railings in residential homes and apartment buildings. The company's business gradually grew and it was awarded its first public works project in 1994 or 1995. As of 2002, All West Iron was working on projects valued at more than $10 million. Between 2002 and 2008, All West Iron submitted an average of two to three bids per week on both private and public projects, and performed steel subcontracting work for a variety of general contractors. All West Iron ceased business operations in December 2009, and filed for Chapter 7 bankruptcy on December 14, 2010.

AWI Builders is a general contractor in the construction industry. It was incorporated as a C corporation in June 2002 and became a S corporation in January

---

[1]    None of the plaintiffs in the *Robles* action are parties to this appeal.

2004. Its business address is 2881 Saco Street and it occupies the second floor of the building at that address. Mekikyan is the vice president of AWI Builders and his wife, Anna, is the president. They are the sole officers and shareholders of the company. Since its incorporation, AWI Builders has acted solely as a general contractor and never as a subcontractor. The company initially worked on small construction projects valued at less than $500,000, but by 2011, its business had substantially grown and it was hired as the general contractor on a public works project valued at $18 million. Approximately 90 percent of the company's business has been in public works projects. In some projects where AWI Builders was the general contractor, All West Iron was the steel subcontractor. However, AWI Builders has been the general contractor on projects that did not involve any structural steel work, and All West Iron did not perform any work on those projects.

CCC is a multi-trade subcontractor in the construction industry. It was incorporated as a C corporation in June 2004 and began operations in May 2008. Its business address is 2881 Saco Street and it occupies the first floor space that All West Iron previously occupied. Mekikyan is the president and sole officer and shareholder of CCC.[2] As a multi-trade subcontractor, CCC performs framing, painting, flooring, cabinetry, and structural steel work. Approximately 95 percent of its business has been in public works projects. CCC has submitted subcontracting bids to a variety of general contractors since it began operations and has worked with general contractors other than AWI Builders.

According to Mekikyan, all three companies had to maintain their own general liability insurance and worker's compensation insurance as licensed contractors in the construction industry.[3] They also had to obtain their own performance and payment

---

[2]     At a prior deposition in this action, Mekikyan testified that he did not have an interest in any companies other than All West Iron and AWI Builders.

[3]     On a general liability policy that was issued by Century Surety Company in March 2009, however, both All West Iron and CCC were named insureds on the same policy.

bonding from surety insurers to work on public works projects, which required each company to prepare separate financial statements and maintain separate bank accounts to demonstrate independent bonding capacity. As a general contractor, AWI Builders was required to pre-qualify for surety bonding to bid on certain public works projects. In the five years preceding trial, AWI Builders was pre-qualified to bid on 20 to 25 public works projects, including multi-million dollar construction projects, based on its bonding capacity.

Mekikyan held three types of contractor licenses for All West Iron, AWI Builders, and CCC: (1) a Class C51 license for steel structural fabrication, (2) a Class C23 license for wrought iron fabrication and installation, and (3) a Class B license for a general building contractor. Mekikyan was the managing officer responsible for maintaining the licenses for each company. He also was the person most responsible for overseeing the day-to-day operations of each company. All three companies had the same written employment policy entitled Company Safety Rules and Discipline Guide, and All West Iron and CCC had the same Injury and Illness Prevention Plan. None of the companies provided employees with any health, pension, or vacation benefits, and none had any written policies pertaining to meal and rest periods, hours of work, or overtime pay.

Between 2005 and 2008, All West Iron and AWI Builders entered into a number of subcontracting agreements. At times, a secretary signed the agreements on behalf of All West Iron, and Mekikyan signed them on behalf of AWI Builders. All West Iron and AWI Builders also entered into a number of purchase order agreements. Mekikyan would initial the agreements on behalf of his wife for AWI Builders, and then sign them in his own name on behalf of All West Iron. Mekikyan's wife, who is a doctor, stopped performing any work for AWI Builders in 2006 or 2007. Mekikyan testified that any transfers of money from AWI Builders to All West Iron or CCC were payments for subcontracting work. He also testified that All West Iron did not make any transfers of money to Mekikyan, AWI Builders, or CCC within six months of its bankruptcy filing, and that he and his wife did not use any of All West Iron's funds to pay for their personal

5

expenses. Mekikyan drew a salary of approximately $100,000 from AWI Builders and $70,000 from CCC in 2010.

All West Iron leased the building located at 2881 Saco Street until it ceased operations in December 2009. All West Iron occupied the first floor of the building and subleased the second floor to AWI Builders. Some of the sublease agreements between the two companies did not set forth a specific amount of rent and instead stated that the rent was "to be determined." The first floor of the building included office space, two work areas, and a 50,000 square foot shop. A large overhead crane in the shop was used by All West Iron, but was the property of the building owner. In November 2010, about a year after All West Iron closed, CCC entered into a lease agreement with the building owner, and began occupying the first floor space that had been occupied by All West Iron. CCC uses the shop for its business, including the overhead crane, and uses the tables and benches that were left in the work areas. According to Mekikyan, the other machinery and equipment that All West Iron owned, including welding tools and overstock material, were scrapped by the building owner after All West Iron vacated the premises. Like All West Iron, CCC continued to sublease the second floor to AWI Builders.[4]

All West Iron owned four trucks which have been parked at the 2881 Saco Street property since the company closed. Mekikyan testified that CCC does not use any of the trucks owned by All West Iron, and does not lease or own any other vehicles. AWI Builders leases a pickup truck and a small sedan for use by its employees and a Porsche for use by Mekikyan's wife.

All West Iron did not disconnect its business telephone number after it ceased operations. Instead, CCC began using that telephone number for its business. As of trial, when the number was dialed, the caller would hear a voicemail greeting for CCC and

---

[4] The sublease agreement between CCC and AWI Builders took effect in November 2010, but for unexplained reasons, had been signed by both Mekikyan and his wife 11 months earlier in January 2010.

6

then a list of employees with their telephone extensions. The list included employees of both CCC and AWI Builders. A number of managerial and administrative employees and independent contractors who worked for All West Iron later worked for CCC. Those individuals included Irma Parra, Carlos Leonor, Danielle Bogdanovich, George Caradanian, George Sarkisyan, Jessie Abubo, Artem Mkrtchyan, and Nidia Hernandez.[5] Apart from Irma Parra who did bookkeeping for all three companies, none of these individuals ever worked for or were paid by AWI Builders.

At some point, AWI Builders obtained a permit from the city of Burbank to build a family residence for Mekikyan. As of trial, AWI Builders still held title to the property, but the residence had not been built. Mekikyan testified that AWI Builders purchased the property as an investment and that he did not presently intend to move there with his family. He also testified that the money used to purchase the property came solely from AWI Builders and not from All West Iron.

Mekikyan produced corporate records for All West Iron and AWI Builders at trial. With respect to All West Iron, its bylaws were unsigned and included numerous blank spaces. There were records of a 2006 annual meeting of shareholders and directors which were signed by Mekikyan, but no records of any other corporate meetings. Mekikyan testified that All West Iron's last board meeting occurred in 2009 or 2010 and was held at the company with all of All West Iron's employees, but he did not have any minutes or other records of that meeting. AWI Builders' bylaws were not produced. Other corporate compliance documents for AWI Builders, including shareholder and director consent forms, were unsigned and undated. Some of the documents referred to the company as AWI Builders while others referred to it as AWI Construction Corporation.

---

[5] George Caradanian was the superintendent for the shop and George Sarkisyan was the superintendent for outside projects at both All West Iron and CCC. They were also the direct supervisors of the plaintiffs when they worked at All West Iron. Of the 10 individuals who were listed on All West Iron's 2005 organization chart, nine later worked for CCC.

In the December 2010 bankruptcy filing for All West Iron, Mekikyan stated that the company had assets of $1,500 and liabilities of $3 million. The only identified assets were a checking account and office furniture; no vehicles, machinery, fixtures, or equipment used in the business were listed. There were 12 unsecured creditors identified, including the plaintiffs in the *Talamentes* and *Robles* actions and in other pending lawsuits filed against All West Iron.[6] Mekikyan represented in the bankruptcy filing that All West Iron earned no income in 2008 or 2010, and earned $953,900 in income from AWI Builders in 2009.[7] Mekikyan further represented that, within the past two years, no bookkeepers or accountants had kept records for All West Iron, and no firm or individual had conducted an audit of records or prepared a financial statement for the company. Mekikyan also indicated that no inventories had been taken of the company's property.

### B. Talamentes's Employment with All West Iron

Talamentes worked as a welder for All West Iron from January 2004 to September 2005. He performed all of his work in All West Iron's shop. Mekikyan's uncle, who was known in the shop as "Big George," hired Talamentes, set his work schedule, recorded his work hours, and gave him a paycheck every two weeks. Talamentes attended meetings at All West Iron where Mekikyan spoke to the employees about work issues, but otherwise had no direct contact with Mekikyan. Big George and Mekikyan worked in the first floor office space occupied by All West Iron, and at times, Talamentes saw both of them go into the second floor space occupied by AWI Builders. He never saw Mekikyan's wife in the building.

---

[6] Mekikyan initially testified that there were no unpaid judgments pending against All West Iron at the time it filed for bankruptcy. He later admitted, however, that there was a judgment entered against All West Iron, AWI Builders, Mekikyan, and his wife in October 2009 for $897,634, and that such judgment had been stayed by the bankruptcy court.

[7] According to business records presented at trial, however, All West Iron received a number of payments from AWI Builders in 2008 for subcontracting work.

8

During his employment, Talamentes was provided with a written policy on work rules and procedures, which identified All West Iron and AWI Builders in the document heading and was used by both companies. On one occasion, Talamentes was issued a written warning by Irma Parra, the bookkeeper for both companies, but he refused to sign the warning because he did not understand it. Talamentes was given welding tools for use at work, but no safety tools, and he had to bring his own mask, goggles, and gloves to work. All West Iron did not provide Talamentes with health insurance or workers' compensation insurance benefits, and did not pay him when he was injured at work and had to be out for a period of time.

Talamentes worked 60 hours a week from Monday through Saturday. He received his regular rate of pay for any overtime hours worked. Big George told Talamentes that the company did not pay overtime wages and that if Talamentes did not like it, he could leave. Talamentes always was paid for his work in checks issued by All West Iron. He never received any checks from AWI Builders or Mekikyan. Other employees were paid in both checks and cash, and some of them complained that they received old $100 bills that could not be used. All employees, including Talamentes, had to pay All West Iron $5 per week to clean the bathroom in the shop. All West Iron did not provide Talamentes with any tax reporting forms and did not withhold any taxes from his paychecks.[8] Talamentes believed All West Iron and AWI Builders were the same company because Mekikyan told him that he was the owner of both. Talamentes did not know which employees worked for which company.

### C.    The *Robles* Plaintiffs' Employment with All West Iron

Jose Robles, Juan Robles, and Felipe Alvarado each worked as a welder for All West Iron. They regularly worked more than 40 hours a week and often more than 10

---

[8]    All West Iron produced copies of certain IRS Forms 1099-MISC, which it claimed were issued to Talamentes for the 2004 and 2005 tax years. However, the recipient's tax identification number was not included on those forms and Talamentes testified that he never received them.

hours a day. They were permitted to take one meal period per day, but no rest periods. They were not paid overtime wages for any of the overtime hours that they worked. They also were not paid the prevailing wage rate when they worked on public works projects. Juan Robles was paid by All West Iron solely in checks. Jose Robles and Alvarado were paid by All West Iron in both checks and cash. Mekikyan told the employees that they were receiving some of their wages in cash so that they would not have to report those wages as income on their tax returns. From the wages that they were paid, the employees had to pay $5 per week back to All West Iron to clean the bathroom in the shop. All West Iron did not provide the employees with worker's compensation insurance, health insurance, or any other employee benefits.

Employees from both All West Iron and AWI Builders used the trucks owned by All West Iron to travel to and from work sites. While working for All West Iron, the *Robles* plaintiffs did not work for any other companies. They were paid for their work solely by All West Iron and did not receive any paychecks from AWI Builders, CCC, or Mekikyan. Both Jose Robles and Alvarado were fired by Mekikyan, who refused to give them their final paychecks because they did not sign a release stating that they were leaving voluntarily.

### D.  Persons Responsible for All West Iron's Business Records

Irma Parra worked as an independent contractor for All West Iron and AWI Builders. She provided bookkeeping services for both companies, and also assisted with billing and invoicing for CCC. Her job duties when she worked for All West Iron included bookkeeping, billing and invoicing, and processing payroll checks. She signed the paychecks that were issued to Talamentes. All of the payroll information that Parra used to process checks for All West Iron was stored on a computer in the company's office. Parra stopped working for All West Iron when it closed, and was unaware of any financial problems with the company.

Carlos Leonor worked as an independent contractor for All West Iron and CCC. He began working for CCC after All West Iron closed. His job title at both companies

10

was payroll officer and his primary job duty was to prepare certified payroll records for their public works projects. Leonor saved all of the records that he prepared on compact discs that were stored at the office. In preparing the certified payroll records, he relied on the pre-printed hours listed on daily sign-in sheets and on the wage rates listed on the Department of Industrial Relations website. He did not use the actual hours worked by employees or their actual rates of pay to prepare the records. Some of the employees who worked for All West Iron later worked for CCC. After All West Iron closed, CCC took over use of All West Iron's fabrication shop and office equipment. Leonor used the same computer and same office furniture when he worked for All West Iron and CCC. The only person that Leonor believed worked in AWI Builders' offices on the second floor was a secretary named Dina.

Danielle Bogdanovich was an employee of All West Iron from 2005 to 2008. She began working as an employee of CCC in January 2009. Her job duties when she was hired at CCC were the same duties she performed at All West Iron. At both companies, Bogdanovich was responsible for product administration and purchase orders, and also acted as the custodian of records. She was never paid for her work by AWI Builders or Mekikyan personally, and she never saw Mekikyan use corporate funds to pay for his personal expenses. Bogdanovich worked solely on the first floor of the building during her employment with both All West Iron and CCC, and she did not perform any work on the second floor occupied by AWI Builders. After All West Iron closed, all of its business records continued to be stored at the Saco Street address.

E.      Financial Statements for All West Iron, AWI Builders, and CCC

Craig Cleveland is a certified public accountant and a partner in the independent accounting firm of Jones, Henle & Schunck. Cleveland's firm prepared unaudited annual financial statements for AWI Builders from 2008 to 2010 and for CCC from 2009 to 2010. The purpose of these financial statements was to allow AWI Builders and CCC to obtain surety bonds for public works projects. Cleveland was not aware of any instance where a surety had denied bonding for AWI Builders or CCC. In the course of preparing

11

the financial statements, he never saw anything to suggest that Mekikyan was using either AWI Builders or CCC as a shell company.

Cleveland testified that any transfer of funds between AWI Builders and CCC were disclosed in the financial statements as related party transactions. The financial statements for AWI Builders identified CCC as a related party that was owed $271,739 as of December 2009 and $1.99 million as of December 2010. AWI Builders' financial statements showed that a shareholder withdrew $791,668 from the company in 2008 and deposited $750,000 of personal funds back into the company in March 2009. They also showed shareholder distributions totaling $172,536 as of December 2008, $246,682 as of December 2009, and $1,734,673 as of December 2010. CCC's financial statements did not reflect any shareholder distributions, but did identify shareholder advances totaling $100,000 as of May 2009 and $45,000 as of May 2010.

Cleveland's firm did not prepare any financial statements for All West Iron, and Cleveland had no personal knowledge as to whether All West Iron had filed for bankruptcy. All West Iron used a different accountant to prepare its annual financial statements between 2002 and 2008. The company's 2008 financial statement reflected a "note receivable" from an officer for $955,097, but Mekikyan could not recall at trial whether that amount was ever paid back. All West Iron did not have any financial statements prepared after June 2008.

## III.    The Statement of Decision

On October 31, 2011, after the close of evidence in the *Talamentes* and *Robles* actions, the bankruptcy case for All West Iron was closed. On June 28, 2012, the trial court issued its statement of decision in the consolidated actions. With respect to Talamentes, the trial court found that he worked overtime hours while employed by All West Iron and that he was not paid overtime compensation or penalties for missed meal and rest periods. With respect to the *Robles* plaintiffs, the trial court found that each of the plaintiffs worked on public works projects while employed by All West Iron, and that

12

each of them was not paid the prevailing wage rate, overtime compensation, or penalties for missed meal and rest periods.[9]

With respect to the liability of Mekikyan, AWI Builders, and CCC for these wage and hour violations, the trial court found that the plaintiffs did not meet their burden of proving by a preponderance of the evidence that AWI Builders, CCC, or Mekikyan was an alter ego of All West Iron. The trial court further found that plaintiffs did not meet their burden of proving that AWI Builders, CCC, or Mekikyan was a joint employer of the plaintiffs, or that AWI Builders or CCC was liable as a successor corporation. The trial court thus concluded that each of the defendants against whom the case was tried was entitled to judgment in its favor. On August 9, 2012, the trial court entered a judgment against the plaintiffs in both the *Talamentes* and *Robles* actions and in favor of AWI Builders, CCC, and Mekikyan. Talamentes thereafter filed a timely notice of appeal.

## DISCUSSION

On appeal, Talamentes argues that the judgment against him must be reversed because the trial court erred in finding that AWI Builders, CCC, and Mekikyan were not liable under the alter ego doctrine, and in finding that CCC was not liable under the successor liability doctrine. He also asserts that the trial court erred in finding that each of these defendants was not liable as a joint employer with All West Iron.

## I.    Standard of Review

We ordinarily review a challenge to the sufficiency of the evidence supporting a judgment under the substantial evidence standard of review. Under this standard, "all

---

**9**     As discussed, due to the bankruptcy stay, the *Talamentes* and *Robles* actions did not to proceed to trial against All West Iron, and instead proceeded solely against Mekikyan, AWI Builders, and CCC. The trial court nevertheless found that each of the plaintiffs had been subjected to various Labor Code violations during their employment with All West Iron. None of the defendants against whom the actions were tried has challenged these findings on appeal.

13

conflicts must be resolved in favor of the [prevailing party], and all legitimate and reasonable inferences indulged in to uphold the [judgment] if possible. … When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.'  [Citation.]"  (*Western State Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.)  "'[N]either conflicts in the evidence nor '"testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'"  [Citations.]'"  (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)

As appellate courts have recognized, however, "[i]n the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. … [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]"  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528; see also *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838; *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465-466.)  The determination of whether the trial court applied the correct legal standard in making a finding or order is a question of law subject to de novo review.  (*Hoover v. American Income Life Ins. Co.* (2012) 206 Cal.App.4th 1193, 1203; *In re Marriage of David & Martha M.* (2006) 140 Cal.App.4th 96, 100-101.)

## II.    Alter Ego and Successor Liability

### A.    Relevant Law

""""Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors.  Under the alter ego doctrine, however, where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation.  [Citations.] …'" [Citation.]" (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1106-1107.)  "In California, two conditions must be met before the alter ego doctrine will be invoked.  First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone. [Citations.]" (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538.)  "'[T]he corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require.'  [Citation.]" (*Leek v. Cooper* (2011) 194 Cal.App.4th 399, 411; see also *Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 810 ["'[a]lter ego is a limited doctrine, invoked only where recognition of the corporate form would work an injustice to a third person'"].)

The factors for the trial court to consider in deciding whether to apply the alter ego doctrine include the following:  "'[1] [c]ommingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses . . .; [2] the treatment by an individual of the assets of the corporation as his own . . .; [3] the failure to obtain authority to issue stock or to subscribe to or issue the same . . .; [4] the holding out by an individual that he is personally liable for the debts of the corporation . . .; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities . . .; [5] the identical equitable ownership in the two entities; the identification of the equitable

15

owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family . . .; [6] the use of the same office or business location; the employment of the same employees and/or attorney . . .; [7] the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization . . .; [8] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation . . .; [9] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities . . .; [10] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities . . .; [11] the use of the corporate entity to procure labor, services or merchandise for another person or entity . . .; [12] the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another . . .; [13] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions . . .; [14] and the formation and use of a corporation to transfer to it the existing liability of another person or entity.' [Citation.] … [¶] This long list of factors is not exhaustive. The enumerated factors may be considered '[a]mong' others 'under the particular circumstances of each case.' [Citation.]" (*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft* (1999) 69 Cal.App.4th 223, 249-250.)

"Because it is founded on equitable principles, application of the alter ego [doctrine] '"is not made to depend upon prior decisions involving factual situations which appear to be similar. . . ."'" [Citations]" (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.*, *supra*, 217 Cal.App.4th at p. 1108.) Rather, "'[t]he conditions under which the corporate entity may be disregarded vary according to the circumstances in each case and the matter is particularly within the province of the trial court. [Citations.]' [Citation.]" (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1071-1072.) "Whether the

16

evidence has established that the corporate veil should be ignored is primarily a question of fact which should not be disturbed when supported by substantial evidence. [Citation.]" (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.*, *supra*, at p. 1108.)

The general rule on successor liability provides that "'where one corporation sells or transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former unless (1) the purchaser expressly or impliedly agrees to such assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape liability for debts. [Citations.]' [Citations.]" (*McClellan v. Northridge Park Townhome Owners Assn.* (2001) 89 Cal.App.4th 746, 753, italics omitted.) With respect to the third exception, "'California decisions holding that a corporation acquiring the assets of another corporation is the latter's mere continuation and therefore liable for its debts have imposed such liability only upon a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations. [Citations.]'" (*Id.* at p. 754, fn. 4.) "[S]uccessor liability, like alter ego and similar principles, is an equitable doctrine. As with other equitable doctrines, 'it is appropriate to examine successor liability issues on their own unique facts' and '[c]onsiderations of fairness and equity apply.' [Citation.]" (*Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1330.)

### B.     Application to the *Talamentes* Action

In this case, the trial court found that the plaintiffs had failed to meet their burden of proving by a preponderance of the evidence that AWI Builders, CCC, or Mekikyan was an alter ego of All West Iron, or that CCC was a successor corporation of All West Iron. On appeal, Talamentes contends that the evidence was insufficient to support the trial court's alter ego and successor liability findings, and that the trial court did not apply the correct legal criteria in making its findings. We conclude that these claims lack merit.

17

In support of their theories of alter ego and successor liability, the plaintiffs in the *Talamentes* and *Robles* actions presented evidence that Mekikyan was the sole officer and shareholder of All West Iron and CCC, and that Mekikyan and his wife were the sole officers and shareholders of AWI Builders. Neither All West Iron nor AWI Builders maintained adequate corporate formation and compliance records. Mekikyan held the same three types of contractor licenses for All West Iron, AWI Builders, and CCC, and was the person most responsible for overseeing the day-to-day operations of each company. All three companies operated out of the same building at 2881 Saco Street in Vernon, California, and CCC occupied the same first floor fabrication shop and office space that All West Iron occupied prior to closing. When CCC moved into the building, it began using the same overhead crane, work benches and tables, and office furniture that All West Iron used when it occupied the premises. The trucks owned by All West Iron were used by employees of both All West Iron and AWI Builders, and the trucks remained on the Saco Street property after All West Iron closed. All West Iron did not disconnect its business telephone number after it ceased operations and instead allowed CCC to use that same telephone number for its business. When the number was dialed, the caller was provided with a list of employees of both CCC and AWI Builders. At least 10 individuals who worked for All West Iron later worked for CCC, including the majority of All West Iron's management and administrative team. All West Iron ceased operations in December 2009 but did not file for bankruptcy until a year later. The bankruptcy documents that Mekikyan filed on behalf of All West Iron in December 2010 did not disclose all of the company's assets, income, or recordkeeping information.

In support of their defense, AWI Builders, CCC, and Mekikyan presented evidence that All West Iron was incorporated in or about 1990, AWI Builders was incorporated in 2002, and CCC was incorporated in 2004. While all three companies worked in the construction industry, All West Iron operated solely as a steel subcontractor, AWI Builders as a general contractor, and CCC as a multi-trade subcontractor. In some of the construction projects where AWI Builders was the general contractor, All West Iron and CCC performed work for AWI Builders as subcontractors

18

and were paid for their work by AWI Builders pursuant to subcontracting agreements. However, both All West Iron and CCC worked for a variety of general contractors other than AWI Builders, and AWI Builders worked as a general contractor on projects where neither All West Iron nor CCC were used as subcontractors. Each company prepared separate financial statements, which were submitted to surety insurers to obtain bonding for public works projects, and each company showed sufficient bonding capacity to be hired on such projects. Any transfers of funds between the companies or distributions to shareholders were disclosed in AWI Builders' and CCC's annual financial statements, and the certified public accountant who prepared their 2008 to 2010 financial statements testified that he saw no evidence that either corporation was being used as a shell company. The evidence showed payments from AWI Builders to All West Iron and CCC for their subcontracting work, but no commingling of funds between the companies.

The defense also presented evidence that All West Iron and AWI Builders occupied separate floors of the building at the Saco Street address pursuant to a sublease agreement between the two companies. CCC did not begin occupying the first floor of the building until All West Iron's lease expired and CCC entered into a separate lease agreement with the building owner and a separate sublease agreement with AWI Builders. While it appears that CCC took possession of some of the office furniture and equipment owned by All West Iron, Mekikyan testified that most of the machinery and materials in the fabrication shop either belonged to the building owner or were scrapped by the building owner when All West Iron vacated the premises. Mekikyan also testified that CCC did not use any of the trucks that All West Iron left on the property. Although a number of All West Iron's employees were later hired by CCC in essentially the same job positions, there was no evidence that All West Iron transferred any funds or other assets to CCC or AWI Builders when it ceased business operations. Each of the plaintiffs, including Talamentes, solely worked for All West Iron, and none ever worked for or were paid by AWI Builders, CCC, or Mekikyan personally.

In its statement of decision, the trial court set forth the correct legal criteria for determining the applicability of the alter ego doctrine. The court accurately described the

unity of interest and equitable interest requirements, and identified the long list of factors that may be considered by the trier of fact in making its determination. The court also summarized the evidence presented by each side to support its position on whether alter ego or successor liability should be imposed under the circumstances of the case. The record reflects that the trial court carefully weighed the evidence presented at trial and considered the closing arguments of counsel. The court acknowledged that some of the evidence supported the plaintiffs' position and other evidence supported the defense. Based on the totality of the evidence, however, the trial court found that the plaintiffs had failed to prove by a preponderance of the evidence that AWI Builders, CCC, or Mekikyan was the alter ego of All West Iron, or that CCC was a successor corporation of All West Iron. Given the conflict in the evidence presented, Talamentes cannot show that he was entitled to a contrary finding as a matter of law.

Talamentes argues on appeal that any failure by the plaintiffs to prove alter ego or successor liability was the result of the defendants' failure to produce complete corporate and financial records in response to the plaintiffs' notices to produce such documents at trial. The transcript of the trial proceedings reflects that Talamentes' counsel did raise a concern about the defendants' failure to produce all of the requested documents, and was advised by the trial court to bring a motion to compel production of the missing records. Although Talamentes later offered into evidence copies of his notices to Mekikyan and AWI Builders to appear and produce documents at trial, there is nothing in the record to suggest that his counsel ever moved to compel production of any documents. In any event, the record reflects that, during the parties' closing arguments and post-trial briefing, the trial court gave due consideration to the defendants' failure to produce complete business records and the reasonable inferences to be drawn therefrom. The court ultimately concluded that the evidence did not support a finding of alter ego or successor liability under the circumstances of the case. It was the exclusive province of the trial court to resolve the conflicts in the evidence, to determine the credibility of the witnesses, and to draw reasonable inferences from the facts, and it is not the role of this court to substitute its view of the evidence for that of the trial court. (*Western State*

20

*Petroleum Assn. v. Superior Court*, *supra*, 9 Cal.4th at p. 571; *Lenk v. Total-Western, Inc.*, *supra*, 89 Cal.App.4th at p. 968.) Considering the totality of the evidence, Talamentes has failed to demonstrate any error in the trial court's findings on alter ego and successor liability.

## III.    Joint Employer Liability

### A.    Relevant Law

California's Industrial Welfare Commission (IWC) promulgated Wage Order No. 16, codified at California Code of Regulations, title 8, section 11160 (Wage Order 16), to regulate the wages, hours, and working conditions in the construction industry.[10] Wage Order 16, like all of the IWC wage orders, defines the term "employ" as "to engage, suffer, or permit to work," and the term "employer" as "any person as defined in § 18 of the Labor Code, who directly or indirectly, or through an agent, or any other person, employs, or exercises control over the wages, hours, and/or working conditions of any person." (Cal. Code. Regs., tit. 8, § 11160, subd. (2)(G), (2)(I).) Section 18 of the Labor Code defines "person" as "any person, association, organization, partnership, business trust, limited liability company, or corporation." (Lab. Code, § 18.)

The California Supreme Court first construed the definition of "employer" as used in the IWC wage orders in *Reynolds v. Bement* (2005) 36 Cal.4th 1075 (*Reynolds*). The plaintiff in *Reynolds*, a former employee of an auto painting company, sued both the company and its individual officers and directors to recover unpaid overtime wages under Labor Code section 1194. The individual defendants demurred on the ground that they were not the plaintiff's employer. The Supreme Court in *Reynolds* first observed that "the plain language of [the applicable wage order] defining employer does not expressly impose liability under [Labor Code] section 1194 on individual corporate agents." (*Id.* at p. 1086.) The Court then applied the common law test of employment under which

---

**10**    The IWC is the state agency empowered to formulate regulations (known as wage orders) governing minimum wages, maximum hours, and overtime pay in California. (*Heyen v. Safeway Inc.* (2013) 216 Cal.App.4th 795, 816, fn. 2.)

"corporate agents acting within the scope of their agency are not personally liable for the corporate employer's failure to pay its employees' wages." (*Id*. at p. 1087.)  Based on the common law test, the Court held that the plaintiff could not state a Labor Code section 1194 cause of action against the individual defendants. (*Id*. at pp. 1087-1088.)  The Court also held that, while corporate directors may be "'jointly liable with the corporation and may be joined as defendants if they personally directed or participated in . . . tortious conduct,'" the "failure to comply with statutory overtime requirements . . . does not qualify" as tortious conduct. (*Id*. at pp. 1089-1090.)

In *Martinez v. Combs* (2010) 49 Cal.4th 35 (*Martinez*), the California Supreme Court reexamined the IWC's definition of employer in actions to recover unpaid wages under Labor Code section 1194.  The plaintiffs in *Martinez* were seasonal agricultural workers who sued their former employer, a strawberry farmer, for failing to pay minimum wages and violating other provisions of the Labor Code.  The farmer had been discharged in bankruptcy and the plaintiffs sought to hold two produce merchants and a field representative for one of the merchants liable as joint employers.  The Supreme Court held that the IWC's definitions of the employment relationship applied in actions to recover unpaid wages under Labor Code section 1194. (*Id*. at p. 52.)  The Court also held that the term "employ" as used in the IWC wages orders "has three alternative definitions.  It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Id*. at p. 64.)  The *Martinez* court partially abrogated the *Reynolds* decision to the extent it held that the common law, rather than the applicable wage order, defined the employment relationship for purposes of an action under Labor Code section 1194. (*Id*. at pp. 63-64.)  However, the *Martinez* court reaffirmed its prior holding in *Reynolds* that "the IWC's definition of 'employer' does not impose liability on individual corporate agents acting within the scope of their agency." (*Id*. at p. 66, citing *Reynolds*, *supra*, at p. 1086.)

Accordingly, under *Reynolds* and *Martinez*, a plaintiff may not bring an action to recover unpaid wages under the Labor Code against individual officers or directors of a

corporate employer acting within the scope of their agency. A plaintiff seeking to hold an affiliated corporation liable for unpaid wages as a joint employer must demonstrate that such entity meets the IWC's definition of "employer" as set forth in *Martinez*.

### B. Application to the *Talamentes* Action

In its statement of decision, the trial court found that the plaintiffs had failed to meet their burden of proving by a preponderance of the evidence that AWI Builders, CCC, or Mekikyan was a joint employer of the plaintiffs. Talamentes asserts that there was insufficient evidence to support the trial court's finding that the joint employer theory of liability did not apply. We see no error in the trial court's ruling.

With respect to Mekikyan, he was named as a defendant in the *Talamentes* action based on his position as an officer and shareholder of All West Iron and AWI Builders. There was no evidence that Mekikyan ever acted outside the scope of his agency as All West Iron's president and managing officer when he failed to provide Talamentes with statutorily mandated overtime compensation and meal and rest periods. Nor was there any evidence that Mekikyan misappropriated the unpaid wages to himself for his independent advantage. Based on the holdings in *Reynolds* and *Martinez*, Mekikyan cannot be held individually liable for All West Iron's Labor Code violations.

With respect to AWI Builders and CCC, the evidence does not mandate a finding as a matter of law that either company met the IWC's definition of employer for purposes of imposing joint employer liability. Talamentes admitted that he worked exclusively in All West Iron's shop during his employment with the company. His paychecks were issued solely by All West Iron and he did not receive any payments from AWI Builders or Mekikyan. He was hired and supervised by "Big George" Caradanian, who was an All West Iron employee at the time Talamentes worked for the company. There was evidence that Talamentes received a written policy on work rules and procedures, which identified both All West Iron and AWI Builders in the document heading and applied to employees of both companies. There was also evidence that all three companies used the same versions of other employment policies. However, there was no evidence that AWI

23

Builders or CCC exercised any control over Talamentes's wages, hours, or working conditions, ever suffered or permitted him to work, or engaged him in any work. Although Talamentes believed that All West Iron and AWI Builders were the same company, he testified that he based his belief on the fact that Mekikyan said that he was the owner of both. Given this record, Talamentes has failed to show that he was entitled to a finding of joint employer liability as a matter of law. The trial court did not err in granting judgment in favor of AWI Builders and Mekikyan on Talamentes's claims.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.


ZELON, J.


We concur:



PERLUSS, P. J.



WOODS, J.